Filed 9/21/20  P. v. Pallan CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICHARD PALLAN,<br><br>    Defendant and Appellant. | B282709<br><br>Los Angeles County<br>Super. Ct. No. VA136537 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Roger Ito, Judge.  Judgment of conviction affirmed and remanded for further proceedings.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Richard Pallan of the first degree murder of Jessica Gomez, and found true that Pallan discharged the firearm that killed her. He appeals, arguing his trial counsel was ineffective. We affirm his conviction and remand for resentencing in light of Senate Bill No. 620 and Senate Bill No. 1393.

## BACKGROUND

An information charged Pallan and Cecilia Gallegos murdered Jessica Gomez on or about June 26, 2013, and alleged Pallan personally and intentionally discharged the firearm that killed Gomez. (Pen. Code,[1] §§ 187, subd. (a), 12022.53, subds. (b)-(e).) The information also charged Billy Juarez was an accessory after the fact (§ 32), and alleged both crimes had been committed for the benefit of a criminal street gang. (§ 186.22(b)(1)(C).) The information alleged Pallan and Juarez had prior convictions of serious and/or violent felonies. (§§ 667, subd. (d), 1170.12, subd. (b).)

Before jury selection, the trial court dismissed the gang allegation for insufficient evidence. The court allowed gang evidence for limited purposes.

### 1. *Gallegos's testimony*

Gallegos testified Juarez was her ex-boyfriend and a member of Pico Nuevo, a gang from Pico Rivera. Two weeks before the shooting, Juarez (called "Ghost") introduced her to Pallan (called "Johnny" and "Gook") and told her Pallan also was a Pico Nuevo. On June 26, 2013, Juarez and Pallan were at Gallegos's mother's house in Pico Rivera. They seemed antsy, and Gallegos was unsure what was going on. At about

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

11:00 p.m., they asked her for a ride to a liquor store in Whittier. Gallegos drove them in her white Dodge Magnum, with Pallan in the front passenger seat and Juarez in the back seat. Pallan was texting on his cellphone. She dropped Juarez off at a residential intersection near Gomez's house. Juarez was close to Gomez and called her his cousin.

Gallegos was nervous because it was the first time she had been alone with Pallan. She made a detour, drove around the corner and into a dead end, and stopped the car. She saw in Pallan's pocket what she later realized was a gun, the kind with a barrel that spins around. He was looking around nervously and checking the rearview mirror. When Pallan told her to turn around to pick up Juarez, Gallegos made a U-turn and began to drive back. Her anxiety increased as they got closer. Gallegos told Pallan she wanted to leave, noticing an "evil" look on his face.

When Gallegos saw Juarez walking with Gomez, she "pulled over and [Juarez] was supposed to get back in the car." Pallan got out of the car, Juarez got into the back seat, and she heard shots fired at Gomez.

Scared, Gallegos turned away and closed her eyes. Pallan got back into the car. Gallegos drove away, asking: " 'What the fuck is going on?' " Juarez, seeming unsurprised by the shooting, told her to calm down. Pallan gave her directions to drive to the 605 North. Once on the freeway, Pallan pointed the gun at her and asked: " 'Is this bitch going to fucking say anything?' "

They ended up at a house Gallegos had never been to before. Pallan and Juarez went inside, and she waited in the back yard. Within a couple of minutes she learned Gomez was dead. Later, Pallan and Juarez came outside, and she overheard

3

Pallan say: "[O]nce he seen [Gomez] and [Juarez] come around the corner, he already knew it was all over." Juarez responded: "It wasn't supposed to go down like that," and Pallan replied: "He had to do what he had to do." Pallan pulled out the gun again, and asked Juarez whether Gallegos would say anything. She thought she would be the next to die.

Gallegos drove Juarez to his sister-in-law's house. She never spoke to Pallan again. Her relationship with Juarez ended a month later, and she had not seen or spoken to him since.

When a detective interviewed Gallegos about a year after the shooting, she lied because she was scared: "I just didn't want things to happen to me or to my family. So I was just going to keep my mouth shut and not say anything." She worried about "the whole street mentality of the street gang," and her life experiences taught her snitching was bad: "Whatever you see you don't say nothing." The next day two detectives came to interview her and told her she was being charged with a crime. She still did not tell them what she knew. Eventually she gave statements about what happened in a recorded interview with her attorney present: "I'm not going to go down for something I didn't do and I figured if nobody was going to come forward and say something then for me to be able to save my own life I have to." Gallegos had been in custody ever since. After she was charged with first degree murder, she agreed to testify truthfully in exchange for a seven-year state prison sentence.

After Gomez's murder, "local girls that knew me in County" had threatened Gallegos, and she feared retaliation for her testimony. When she was arrested, she was carrying a gun for protection. People had tried to blame her for Gomez's death, but she could not remember who.

4

**2.    *Juarez's testimony***

Juarez testified under subpoena, and had been granted use immunity. He and Pallan were members of the Pico Nuevo Gang. Juarez grew up with Gomez and called her "cousin." He and Gomez were in constant communication around the time she died. Six days before Gomez was shot, someone she knew from Dead End, a rival gang, shot Pallan's cousin Chino, another Pico Nuevo member.

Juarez had a sexual relationship with Gallegos. He was in the back seat of her car and Pallan was in the front passenger seat the night Gomez was killed. Pallan kept saying he was upset that a Dead End member related to Gomez had shot Pallan's cousin. Gallegos dropped Juarez off at Gomez's house, and she and Pallan drove away. As Juarez and Gomez walked on the sidewalk on the way to a liquor store, Gallegos pulled up in the car. Juarez went over to see what she wanted, thinking Pallan had been dropped off somewhere. Then Juarez heard gunshots, but he did not see the shooting. He would not testify that Pallan shot Gomez, and he did not remember telling the detectives that Pallan was the shooter. He did not know Pallan was going to shoot Gomez.

On cross-examination, Juarez explained it was "rumor on the street" that a Dead End member connected to Gomez shot Pallan's cousin. Juarez had been at Pallan's house when Pallan found out that his cousin had been shot. Pallan got upset, but he never said he was going to get back at Gomez. Juarez thought Pallan had a gun but didn't know for sure. He was good friends with Gomez and sometimes she got drugs for him. After the shooting, Gallegos dropped Juarez off at a gas station by the freeway.

### 3. *Xavier P.'s testimony*

At around 9:30 p.m. on the night Gomez was shot, then-12-year-old Xavier P. was riding a scooter to his friend's house. He cut between a man and a woman walking on the sidewalk. He was unlatching his friend's gate, with the man and woman only a couple of feet behind, when a white Dodge Magnum pulled up. A man jumped out of the front passenger side of the car and pulled out a shiny revolver, and Xavier P. heard shots. The man who had been walking with the woman jumped into the back seat, the shooter jumped into the front seat, and the car took off. The woman was lying in her blood. He had seen her around the neighborhood. He did not get a look at the driver of the car, and did not recognize anyone in court from that night.

### 4. *Pallan's interviews*

When the detectives interviewed Pallan on August 21, 2014, he said he did not know Gomez well, hadn't talked to her in years, and heard she had been killed about a week after it happened. He was not in Pico Rivera around the time of the shooting, knew nobody who owned a white Dodge Magnum, and hadn't heard anything about why she was killed. Gomez knew his cousin Chino, who had been shot. Pallan did not know who shot Chino.

In a second interview the next day, the detectives confronted Pallan with his cellphone records showing contacts with Gomez's cellphone just before and on the day of the murder. He responded that maybe he was talking to someone else using her phone, and even if he had talked to Gomez, he was at home in Victorville. Told that his phone records showed he was in Pico Rivera, he said maybe he was there the day before the shooting, but he couldn't remember.

6

**5.** *Forensic evidence*

Deputies responding to the crime scene found Gomez's body lying on a driveway next to a black cellphone. A bullet and a bullet fragment were on the ground by a nearby gate. The bullets had been fired by a .38 special or a .357 magnum, guns with revolving barrels. The same gun had fired bullets recovered by the coroner from Gomez's body.

Gallegos's car was impounded and processed for gunshot residue and fingerprints about two weeks after the shooting. Gunshot residue (which can be transferred from a hand to a surface) was detected on the interior front door. Juarez's fingerprints were inside the car, but Pallan's and Gallegos's were not.

Cellphone evidence extracted from Gomez's phone showed many calls back and forth between Gomez, Pallan, and Juarez in the four days leading up to the shooting on June 26, 2013. Pallan's cellphone had called Juarez's cellphone at 9:12 p.m. the night Gomez was shot, using the cellular tower closest to the shooting scene. At 9:16 p.m. and at 9:25 p.m., both men's cellphones used the same tower. At 9:30 p.m., Pallan's phone made a call using a tower near the 605 Freeway, showing that between 9:25 and 9:30 p.m. Pallan's phone moved north and away from the crime scene.

The autopsy showed Gomez had seven gunshot wounds. The two fatal wounds were to the back of Gomez's left shoulder and to her left back. The other wounds were to her right shoulder, her buttocks, her right hand, and her left wrist. The wounds were consistent with a victim who sees a gun, puts her hands up, turns around to flee, and is shot in the back.

Bullets recovered during the autopsy had been shot from the same gun as the bullets found at the scene.

**6.     *Verdict and sentence***

The jury convicted Pallan of first degree murder and found true he personally used a firearm. The trial court found Pallan's prior conviction true, and sentenced him to 80 years to life in prison (25 years to life for murder, doubled by his prior strike to 50 years, plus a consecutive term of 25 years to life for the firearm enhancement, plus a consecutive term of five years for the prior serious felony conviction enhancement). Pallan was ordered to pay fines and fees totaling $370. He filed a timely notice of appeal.

## DISCUSSION

Pallan argues his counsel was ineffective when she failed to object to evidence of third-party threats and to prosecutorial misconduct. We conclude Pallan has not shown his counsel was ineffective, and we remand for resentencing.

**1.     *Counsel was not ineffective for failing to object to evidence of third-party threats against Gallegos***

During jury selection and after the dismissal of the gang enhancement allegation, the prosecution argued gang evidence was nevertheless admissible to show motive. Juarez would testify that a few weeks before Gomez was murdered, her cousin, a member of a rival gang, shot Pallan's cousin. The court reserved a ruling.

Just after the jury was selected, the prosecutor explained he planned to call Gallegos, and the gang context was "interwoven" in her interviews with the detectives. Gallegos knew Pallan and Juarez were members of Pico Nuevo. She lied to the detectives at first, saying she was not at the shooting.

8

Later, she admitted she was afraid for her life and for her family's life, because Pallan and another Pico Nuevo had threatened her. This would help the jury evaluate Gallegos's credibility. Gallegos also would testify she was at Pallan's house when he learned Gomez's cousin, a rival gang member, had shot his cousin Chino. The court admitted the gang evidence for the limited purpose of explaining Gallegos's initial lack of cooperation, her relationship with Pallan and Juarez, and Pallan's motive to shoot Gomez.

Gallegos testified she was frightened after the shooting when Pallan asked her if she was going to say anything while pointing the gun at her, "[b]ecause I thought I was going to be the next one. I was going to die." She admitted that in her first two interviews she lied to the detectives because she was afraid for herself and her family, given the gang mentality and the dangers of "snitching." In her third interview, after she entered her plea, she had told the truth.

After describing the route she drove on the night of the shooting, Gallegos testified that Juarez was a Pico Nuevo, and she believed Pallan was too. She then described dropping Juarez off, driving away and returning, Pallan getting out of the car to shoot Gomez, and Pallan's subsequent threats if she said anything. She admitted she lied during her first two interviews, and the prosecutor continued:

> "Q.  Now, since that incident the murder or
> since [Gomez] was killed, has anyone
> threatened you?"
> "A.   Yes."
> "Q.   Who?"

9

"A.    Just the local girls that knew me in County."

"Q.    Now, as you sit here today, are you concerned about your safety?"

"A.    Yes."

"Q.    Why?"

"A.    Because I'm testifying."

"Q.    Now, with regards to what you are saying, I need to understand what is your relationship with [Juarez] right now?"

Gallegos responded she had not spoken to Juarez since their relationship ended a month after the shooting, and this exchange followed:

"Q.    Now, with regards to your concern for safety or who are you, or what are you concerned about?"

"A.    Just retaliation for me testifying."

On cross examination, Pallan's counsel asked Gallegos about her plea agreement and her low seven-year sentence. Gallegos admitted the first interview followed her arrest for possession of a gun and methamphetamine, and again admitted she lied in the first two interviews. Defense counsel grilled Gallegos about inconsistencies between her testimony and the third interview, including regarding Pallan's gang membership and whether she saw a gun on the day of the shooting.

On redirect, Gallegos repeated her testimony that Pallan drew a gun on her twice on the day of the shooting, once in the car driving away on the freeway and once at the house when they arrived. She testified Pallan asked Juarez, " 'Is this bitch going to fucking say anything?' "—the first time he pointed the gun

at her—and, she could not remember the exact words he used the second time. After additional questioning about Pallan's statement that he knew it was all over when he saw Gomez and Juarez coming around the corner, and that he did what he had to do, the prosecutor continued:

"Q.   When you were arrested [defense] counsel had asked whether you were arrested with guns and drugs. How many guns are we talking about?"

"A.   One."

"Q.   Were you alone or with others?"

"A.   With others."

"Q.   Who were those individuals?"

"A.   Davon."

"Q.   The gun was it on your person when you were arrested?"

"A.   Yes."

"Q.   Why did you have it?"

"A.   For protection."

"Q.   From what?"

"A.   From anybody trying to harm me."

"Q.   Was it after this murder?"

"A.   Yes."

"Q.   Is that when you got a gun?"

"A.   Yes."

"Q.   Protection from whom?"

"A.   Just anybody."

"Q.   At any point did you receive any threats?"

"A.   Yes."

11

"Q.	From whom?"

"A.	I don't quite remember who.  But just people trying to blame me for what happened."

"Q.	What do you mean?"

"A.	For the killing of [Gomez]."

"Q.	Is that why you felt you had to protect yourself?"

"A.	Yes.

On recross examination, defense counsel asked:

"Q.	Miss Gallegos, you indicated that you had been getting threats after [Gomez] was killed, correct?"

"A.	Yes."

"Q.	And those are threats from people who were upset that they thought you were part of the homicide, correct?"

"A.	Yes."

In closing, the prosecutor did not mention the third-party threats.  Defense counsel argued Gallegos was a liar who couldn't get her stories straight, and she shaped her testimony to protect her plea agreement.  Counsel mentioned the "insinuation" that Gallegos "was getting threatened as a result of people who thought she had something to do with the shooting," and argued "now we know she did."  Counsel reminded the jury it could disbelieve all her testimony given her deliberate lies in the first interviews ("Cecelia Gallegos . . . has been shown to be a liar based on her multiple statements.").  In rebuttal, the prosecutor defended Gallegos's credibility without mentioning the threats.

Pallan argues his counsel was ineffective when he failed to object to Gallegos's testimony that she had been threatened by third parties, because the jury would have attributed the third-party threats to Pallan. We disagree that counsel was ineffective because he did not object.

Pallan has a state and federal constitutional right to the effective assistance of counsel. To show that he did not receive that assistance, he must establish by a preponderance of the evidence that his counsel's representation was objectively unreasonable, and that it is reasonably probable that the outcome of his trial would have been different but for counsel's error. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) We defer to counsel's reasonable tactical decisions, and we presume counsel acted within the wide range of reasonable assistance. "It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and filed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

Pallan argues his counsel was ineffective when he failed to object to Gallegos's testimony that "local girls that knew me in County" had threatened her after the murder, and she feared retaliation for testifying; that she lied in her first two interviews because she did not want anything to happen, given the street gang attitude toward "snitching"; and that she felt she needed the gun she had on her when arrested because she had received threats from "people" blaming her for Gomez's murder. He

claims the third-party threat evidence prejudiced him by showing his consciousness of guilt.

" '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 985.)  This is not one of those rare occasions.

Evidence Code section 780 (as the jury was instructed in this case) allows the finder of fact to "consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of [her] testimony," including the existence of any bias or interest, or the witness's attitude toward the giving of testimony.  (Evid. Code, § 780, subds. (f) & (j).)  Evidence that a witness is afraid to testify, or fears retaliation for testifying, is relevant to her credibility and admissible by the trial court.  (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.)  "[E]vidence of . . . a 'third party' threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant."  (*Ibid.*)  Where an eyewitness to a gang shooting testified he left the crime scene and did not voluntarily give information to the police because he did not want anything to happen to his house or family, and described a threatening phone call a few days later and "rata" (Spanish for "rat") spray-painted on his driveway, that evidence was properly admitted.  (*Ibid.*)  That the witness testifies in spite of fear of recrimination is important to fully evaluating her credibility, and " 'it matters not the source of the threat.' " (*Id.* at pp. 1084-1085.)  "[A] trial court has discretion, within the limits of Evidence Code section 352, to permit the prosecution to introduce evidence supporting a witness's credibility on direct examination, particularly when the prosecution reasonably

14

anticipates a defense attack on the credibility of that witness." (*Id*. at p. 1085.)

Gallegos was the prosecution's key witness, and the credibility of her testimony that Pallan shot Gomez was essential to establishing that he murdered Gomez and personally used a firearm. The defense strategy was to use Gallegos's false statements in her first two interviews to attack the credibility of her statements in her third interview and her testimony at trial. The third-party threat evidence was admissible and highly probative on Gallegos's credibility when she testified at trial despite fear of recrimination. (*People v. Mendoza, supra*, 52 Cal.4th at pp. 1084-1085.) No evidence connected Pallan to the third-party threats, so his counsel reasonably did not object that they implied Pallan's consciousness of guilt. "Where a sound legal basis exists for the admission of evidence, an attorney is not ineffective for failing to object to its introduction." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1313.) Any weighing under Evidence Code section 352 would have found the third-party threats more probative than prejudicial.

Objecting also would have drawn the jury's attention to Gallegos's brief references to "local girls that knew me in County" and "people" who made her feel afraid to testify, giving counsel an additional tactical reason not to make a futile objection. "[C]ounsel may have desired not to highlight the evidence by making an objection." (*People v. Seumanu, supra*, 61 Cal.4th at p. 1313.) The prosecutor did not follow up on Gallegos's testimony about the third-party threats or argue the threats were connected to Pallan. Defense counsel could reasonably have concluded an objection was not necessary and would not have been in Pallan's best interests.

We also see no prejudice. First, any objection would have been overruled given the admissibility of the evidence on credibility grounds and the lack of any evidence connecting Pallan to the threats. Second, the evidence of Pallan's guilt was strong. Gallegos's testimony established a motive for the shooting and identified Pallan as the shooter. Pallan's direct threats against Gallegos showed his consciousness of guilt. Defense counsel attacked Gallegos's credibility, but the jury believed her. It is not reasonably probable the verdict would have been different if counsel had objected to the brief testimony about third-party threats.

Pallan also argues his counsel was ineffective because she did not request a limiting instruction specifically telling the jury to consider the third-party threat evidence only to determine Gallegos's credibility. Whether to ask for a limiting instruction is a tactical decision left to defense counsel, where (as here) a reasonable attorney may conclude that giving a limiting instruction specifically focusing on the evidence of third-party threats would suggest to the jury that the evidence was relatively strong, outweighing the questionable benefits of the instruction. (*People v. Griggs* (2003) 110 Cal.App.4th 1137, 1141; *People v. Maury* (2003) 30 Cal.4th 342, 394.) The court instructed the jury to consider evidence of gang activity only to decide whether Pallan had a motive for shooting Gomez, or to explain the witness's lack of cooperation and reluctance to testify. Counsel's decision not to request a more specific limiting instruction was a reasonable tactical choice. Given the absence of any evidence tying Pallan to the third-party threats, no prejudice resulted.

16

**2.    *Counsel was not ineffective in failing to object to statements by the prosecutor***

Pallan points to several instances of what he labels prosecutorial misconduct. Because he failed to object and does not argue an objection would have been futile or a judicial admonition would not have cured any error, he has forfeited a claim of prosecutorial misconduct. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 561.) Pallan recognizes this and contends his counsel was ineffective when she did not object. (*People v. Woodruff* (2018) 5 Cal.5th 697, 780.) "The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) We address the merits of his claims of misconduct only to the extent necessary to decide his claim that his counsel was ineffective in failing to object. (*People v. Ochoa* (1998) 19 Cal.4th 353, 431.)

a.    *Eliciting inadmissible testimony of third-party threats*

Pallan argues the prosecutor committed misconduct because he knew about the third-party threats against Gallegos, did not inform the court, and then used leading questions to elicit her "inadmissible" testimony that unnamed people other than Pallan threatened her after Gomez's murder.

First, the record on direct appeal does not show that the prosecutor knew about third-party threats and hid this knowledge from the court. In the conversation about the admission of gang evidence, the prosecutor told the court that Pallan and another Pico Nuevo had threatened Gallegos, and

17

her testimony about the threats would help the jury decide whether she was credible. The prosecutor advised the court there might be threats by a third party (another Pico Nuevo member). Nothing in the record shows he knew of other third-party threats and concealed that knowledge.

Second, the transcript does not show improper leading questions by the prosecutor. A leading question is one that suggests to the witness the answer examining counsel desires. (Evid. Code, § 764.) A question calling for a "yes or no" answer is not leading unless it is unduly suggestive under the circumstances. (*People v. Harris* (2008) 43 Cal. 4th 1269, 1285.) After Gallegos testified that Pallan had threatened her twice soon after he shot Gomez, the prosecutor asked if anyone had threatened her since then. She answered, "Yes," and he asked, "Who?" She replied: "Just the local girls that knew me in County." The prosecutor's question asked for a yes or no answer. His followup question merely asked who. He might have expected Gallegos to respond "another Pico Nuevo member," just as the prosecutor represented to the court. When she answered instead that it was local girls she knew "in County" (presumably jail), the prosecutor moved on to whether she was concerned about her safety, which related to her credibility. On redirect, the prosecutor asked Gallegos about her possession of a gun when she was arrested and had her first interview, after defense counsel asked her about the gun during cross examination. He asked her why she had a gun, she said for protection from "[j]ust anybody," and he then asked her if she had received threats. She answered yes, he again asked who, and she said she did not remember.

18

The prosecutor asked yes or no questions, and then followed up by asking who.  Those questions were not unduly suggestive.  We note that Pallan does not claim his counsel's failure to object to those questions as leading was ineffective assistance.

Third, as we explained above, the evidence of third-party threats was admissible and highly relevant on the issue of Gallegos's credibility.

No misconduct occurred.  There was no reason for counsel to object.  Even if there were, any objection would have highlighted the evidence that Gallegos had been threatened, giving defense counsel a tactical reason to remain silent.

b.     *Soliciting improper opinion testimony*

Pallan argues the prosecutor committed misconduct when he improperly solicited inadmissible opinion testimony that Pallan was guilty and Gallegos was credible.

Detective Lieutenant Scott Hoglund, the investigating officer, testified about the evidence collected in the case, including the bullet fragments, the cellphone records, the gunshot residue, and his interviews of Pallan (played for the jury).  The prosecutor asked him:

> "Q:    All of these tools and resources that you used were they not only to find potential suspects but also to exclude potential individuals who may not have committed the crime; is that correct?"
>
> "A.    Yes."
>
> "Q.    Now, all the evidence that you gathered and that you have submitted for testing, everything that you worked up in this case, other than the defendant, does

19

> the evidence point to anyone else's guilt
> in terms of who committed the crime?"
>
> "A. No."
>
> "Q. Were you able to exclude other
> individuals to make sure that we
> have the right person?"
>
> "A. Yes."

Detective Hoglund then testified he was present when Gallegos met with the prosecutor to proffer testimony in anticipation of a plea agreement, and her account of what happened the night Gomez was killed was consistent with her testimony in court.

Pallan argues Detective Hoglund improperly expressed his opinion that Pallan was guilty and Gallegos was telling the truth, and his counsel was ineffective for failing to object that the prosecutor committed misconduct in eliciting that testimony through his questioning.

A witness cannot express an opinion about the defendant's guilt or innocence. (*People v. Torres* (1995) 33 Cal.App.4th 37, 47.) This is not because guilt is the ultimate factual question to be decided by the jury, but because a witness's opinion about guilt or innocence is of no assistance to the trier of fact, which is equally competent to weigh the evidence and draw a conclusion on the issue of guilt. (*Ibid.*)

Here, the prosecutor did not ask Detective Hoglund to opine whether Pallan was guilty of murder. He asked whether any of the evidence gathered pointed to anyone other than Pallan, and whether the detective was able to exclude others. Whether the evidence implicated any one else was not something the jury was equally competent to decide. The prosecutor then asked if Gallegos's proffered testimony was consistent with her trial testimony. As a percipient witness at the proffer, Detective Hogland could testify that she told the same story then as she

20

did at trial, but he could not and did not testify that she told the truth. Again, the jury was not in the same position as the detective to decide whether Gallegos's proffered evidence was the same as her testimony at trial. Detective Hoglund did not express an opinion that Pallan was guilty or that Gallegos was truthful. His testimony was not impermissible opinion testimony, the prosecutor did not commit misconduct, and defense counsel had no reason to object.

c. *Improper appeal to sympathy in closing argument*

Pallan argues the prosecutor improperly appealed to the jury's sympathy for Gomez, the murder victim, in closing argument. A prosecutor has wide latitude in closing argument, and his remarks amount to misconduct only if the defendant can show a reasonable likelihood the jury understood the comments in an improper manner. (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1151.)

The prosecutor began his closing argument: "Jessica Gomez. She didn't have to die that way. What we learned through the evidence is that at the very least she had a child. [¶] Five years from now, ten years from now, twenty years from now it doesn't matter. That child used to have a mom and that child no longer has a mom anymore." Although some testimony associated Gomez with drugs, she was nevertheless a victim like any other. "During some of the photos and exhibits we saw photos of the crime scene including blood that was on the sidewalk. That blood should have been coursing through her veins." Pallan argues these comments were an improper appeal to the jury to feel sympathy for the victim.

" '[A]n appeal for sympathy for the victim is out of place during an objective determination of guilt.' " (*People v. Martinez* (2010) 47 Cal.4th 911, 957.) Nor may a prosecutor invite the jury

21

to view the case through the victim's eyes. (*People v. Lopez*, *supra*, 42 Cal.4th at p. 969.) By asking the jury to consider that Gomez's child was now and forever motherless, the prosecutor overstepped his bounds. Although he may have intended to counter the jury's possible negative image of Gomez, appealing to the jury to put themselves in the position of her children was misconduct. By continuing that the blood on the sidewalk should have been coursing through her veins, the prosecutor appealed to the jurors to feel sympathy for Gomez.

But the failure to object to the comments was not ineffective assistance of counsel. Defense counsel may have made a tactical choice not to object at the very outset of the argument. The brief remarks were part of a much longer argument after a long trial during which the prosecutor presented strong evidence of Pallan's guilt, and we see no reasonable probability that they swayed the jury and thereby prejudiced Pallan. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1407.)

3. ***Remand is necessary for the exercise of discretion whether to strike the firearm enhancement and serious felony enhancement, and for Pallan to request a hearing on his ability to pay fines and fees***

Pallan argues, and respondent concedes, that we must remand to allow the trial court to exercise its discretion whether to strike the firearm enhancement. When the court sentenced Pallan in 2017, it had no discretion to strike firearm enhancements proven under sections 12022.5 and 12022.53. (§§ 12022.5, subd. (c), 12022.53, subd. (h).) Senate Bill No. 620, effective January 1, 2018, removed the language prohibiting striking the enhancements and added to both sections: "The court may, in the interest of justice pursuant to Section 1385

and at the time of sentencing, strike or dismiss an enhancement otherwise imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law.”  This statutory amendment applies to Pallan retroactively, as his judgment of conviction was not yet final when the amendment took effect.  (*People v. Zamora* (2019) 35 Cal.App.5th 200, 207.)

During the sentencing hearing, Pallan’s counsel argued Gallegos had pleaded guilty for a lower sentence and Juarez had received use immunity, while Pallan did not get an offer and was subject to a life sentence.  She asked the court to nullify the jury conviction.  She understood the court did not have discretion to strike the firearm enhancement or the five-year felony enhancement, but Pallan did not have a significant record.  The court responded that although Juarez and Gallegos should have “faced liability” for the murder, Pallan was the shooter and primary motivator behind Gomez’s “execution”:  “In my estimation it is a senseless act of violence and it is an unarmed woman.”  Nevertheless, the record does not clearly indicate whether the court would have exercised its discretion to strike the firearm enhancement if it had the authority.  We therefore remand for a hearing at which the trial court can exercise its discretion whether to strike the firearm enhancement.

Pallan’s sentence also includes a five-year enhancement under section 667, subdivision (a)(1) for a prior serious felony conviction.  Senate Bill No. 1393, effective January 1, 2019, removed the prohibition against striking the five-year enhancement by deleting language in the former version of section 1385, subdivision (b) (“This section does not authorize a judge to strike any prior conviction of a serious felony for

23

purposes of enhancement of a sentence under Section 667."
(Sen. Bill No. 1393 (2017-2018 Reg. Sess.) § 2.)).  Because
Pallan's sentence was not final when Senate Bill No. 1393
took effect, the new law applies to him retroactively.  (*People
v. Zamora, supra*, 35 Cal.App.5th at p. 208.)  At the hearing
on remand, the trial court can exercise its discretion whether
to strike the five-year prior serious felony enhancement.

Finally, Pallan argues the $70 in assessments and the
$300 restitution fine violated his right to due process because the
trial court imposed them without determining his ability to pay,
citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  Pallan
was required to contest his ability to pay in the trial court and
present evidence at a hearing to show he was unable to pay those
amounts.  (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490.)
But as we remand for the trial court to exercise its discretion
whether to strike the two enhancements discussed above, Pallan
should raise any challenge to fines or fees at the sentencing
hearing.  (*Id.* at p. 491; *People v. Kopp* (2019) 38 Cal.App.5th
47, 96, review granted Nov. 13, 2019, S257844.)

## DISPOSITION

The matter is remanded for the trial court to consider, at a hearing at which the defendant has a right to be present with counsel, whether to exercise its discretion under Senate Bill No. 620 and Senate Bill No. 1393.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

DHANIDINA, J.

25